## HAMILTON *v.* STATE.

### (*Knoxville.* October 26, 1898.)

1. DEFINITIONS. "*Within.*"

   The term "within" as a limit of time or space or degree, embraces the last day or degree or entire space covered by the limit. (*Post, p. 418.*)

2. JURY TRIAL. *Relationship of juror.*

   Relatives of the sixth degree are related "within" the sixth degree, and incompetent by statute to sit on juries. (*Post, pp. 418, 419.*)

3. NEW·TRIAL. *For disqualification of juror.*

   New trial will not be granted in a criminal case because of a want of general qualification of a juror "*propter defectum*"— *e. g.*, when he was related to the prosecutor within the sixth degree, but otherwise unexceptionable, although the defendant was ignorant of the fact of such relationship when the juror was selected, and for that reason failed to make objection. (*Post, pp. 419, 420.*)

   Cases cited: Riddle *v.* State, 3 Heis., 401; Brakefield *v.* State, 1 Sneed, 215; Norfleet *v.* State, 4 Sneed, 340: Goodall *v.* Thurman, 1 Head, 209; Johnson *v.* State, 11 Lea, 47; Draper *v.* State, 4 Bax., 246; Cartwright *v.* State, 12 Lea, 620; Parrish *v.* State, 12 Lea, 655; Hoard *v.* State, 15 Lea, 318; Spencer *v.* State, 15 Lea, 539; Cantrell *v.* State, 2 Shannon, 249; Finkle *v.* Dunivant, 16 Lea, 503; McClure *v.* State, 1 Yer., 206; Gillespie *v.* State, 8 Yer., 507; Ward *v.* State, 1 Hum., 253; Calhoun *v.* State, 4 Hum., 477.

4. SELF-DEFENSE. *Right of, does not exist, when.*

   One who procured a loaded pistol and brought on a difficulty with another, cannot rely on self-defense where he killed the latter as he was climbing a fence, with a hostile intention, it being apparent that he had no pistol on him, and, at most,

17 P—27

could have had but a knife, and the parties not being at close quarters, and defendant being accompanied by a companion, while the deceased had none. (*Post, pp. 420–424.*)

## FROM KNOX.

Appeal in error from the Criminal Court of Knox County.   T. A. R. NELSON, J.

SAMUEL G. HEISKELL and L. C. HOUK for Hamilton.

Attorney-general PICKLE for State.

WILKES, J.   Defendant is convicted of murder in second degree, and sentenced for twenty years, and has appealed.   It is objected that one of the jurors who tried him was related within the sixth degree to the prosecutor, who was also an important witness.   No challenge was made of the juror when offered, but on motion for a new trial defendant made affidavit of the fact, and that he did not know of it when the juror was sworn.   A juror is disqualified to serve when he is related to the defendant or to the prosecutor within the sixth degree, computing by the civil law.   It is conceded that the juror was related in the sixth degree to the prosecutor.   The term "within," as a limit of time or space or degree, embraces the last day or degree or entire distance covered by the limit.   29 Am. &

Eng. Enc. L., 524; 26 Am. & Eng. Enc. L., 4. The juror was, therefore, incompetent. Can this avail the defendant on his motion for a new trial, and on appeal to this Court? If a partial juror serves on the same, it is ground for new trial if the partiality was unknown to defendant when the juror was sworn. *Riddle* v. *State*, 3 Heis., 401; *Brakefield* v. *State*, 1 Sneed, 215; *Norfleet* v. *State*, 4 Sneed, 340; *Goodall* v. *Thurman*, 1 Head, 209; *Johnson* v. *State*, 11 Lea, 47; *Draper* v. *State*, 4 Bax., 246; *Cartright* v. *State*, 12 Lea, 620; *Parrish* v. *State*, 12 Lea, 655; *Hoard* v. *State*, 15 Lea, 318; *Spencer* v. *State*, 15 Lea, 539. But if the fact is known to the defendant, and no objection is made before the jury is sworn, it is not ground for new trial. *Cantrell* v. *State*, 2 Shan., 249; *Finkle* v. *Dunivant*, 16 Lea, 503. But our cases are uniform, that after the jury is sworn, new trial will not be granted because of the want of general qualification of the juror *propter defectum*, and this is held even though the defendant was ignorant of the fact when the juror was selected. *McClure* v. *State*, 1 Yer., 206; *Gillespie* v. *State*, 8 Yer., 507; *Ward* v. *State*, 1 Hum., 253; *Calhoun* v. *State*, 4 Hum., 477; *Cartright* v. *State*, 12 Lea, 620. The latter case is directly in point, and draws the distinction between the cases when a juror is incompetent *propter defectum* and when he is incompetent because he has prejudged the case. *Id.*; p. 628.

It might have been within the sound discretion of the trial Judge to have granted a new trial, upon this or any other ground which, in his opinion, prejudiced the defendant's right to a fair and impartial trial, but there appeared no evidence of partiality to the prosecutor, or collusion with him, or of prejudice against the defendant in the selection of this juror, and in his denial of relationship to the prosecutor, as it is made to appear that he mistook the name of the prosecutor when it was called upon his examination, and, moreover, the fact of relationship was of so little consequence to him that he could not state whether he was related or not, except from rumor or hearsay.

It is next insisted that defendant is not guilty, but that he killed his antagonist in self-defense. The case has been to this Court before, when a death sentence for the offense was reversed for an inadvertent error in the charge of the Court. See case reported in 13 Pickle, 452. Upon the remand, there was a mistrial, and then the present conviction. The homicide was committed in October, 1895. The deceased, Walter Hansard, and the defendant were paying attentions to the same young lady, and bad blood had developed in their rivalry, and had continued for a year or more, during which time they had quarrels. The homicide occurred on Monday. On Sunday night previous each of the young men had gone to the same country church, each with a different young lady. The defendant and the young lady he was

with were sitting next to a window, when deceased approached from the outside and turned the slats in the blinds. The defendant moved over next to the window, between it and the young lady, and spat out of the window. The deceased thereupon called him a "son of a bitch." Defendant got up and went out of the church, and he and the deceased went off into the woods together to settle their quarrel, but they returned without having any difficulty. After service was concluded, they each started home with his young lady, but defendant, after going with his a short distance, left her, and went a road that did not lead to her home, nor to his, but by the home of the deceased. The parties were both armed, but defendant did not intercept the deceased, and no further trouble ·occurred that night. On the next day defendant went to a store in the neighborhood, bought some cartridges, and freshly loaded his pistol. He then passed along the public road near which deceased lived. This was not his direct road home. Deceased was engaged, near the road, handling some hay or fodder at his uncle's barn. Defendant was accompanied by a friend, named Butcher. He called to the deceased to come down to the road, and deceased came in his shirt-sleeves. Some words passed. Defendant asked deceased if he meant, the night before, to call him a "son of a bitch." Deceased replied that he did, and that he was one, adding an additional epithet.

 Up to this point there is no material difference in

the testimony. There were four eye-witnesses to the killing, three of whom were related to deceased and testified for the State. One, the man Butcher, testified for the defendant. The theory of the defendant is that, when deceased came down to the road and the quarrel was renewed, deceased put his hands upon the fence and mounted it, and, throwing one leg over it, turned his side to defendant, and ran his right hand in his pants pocket in a menacing manner, whereupon he shot. There were five shots fired by the defendant. Deceased was not armed, except that in his right pocket he had an ordinary knife. The theory of the State is that the deceased merely placed his hands on the fence, but did not attempt to cross it, when defendant drew his pistol; that deceased · thereupon ran off up the hill, toward the barn and other houses, and defendant fired at him as he ran, and, when deceased reached a point opposite the barn, he turned to the left, to get behind the house, and at this point the last of the five shots was fired. Two shots took effect. One was in the leg, entering directly behind; the other in the side, passing through the forepart of the arm into the body, and this was the fatal one.

An ingenious argument is made to support defendant's contention and statement, in which he is largely but not entirely supported by Butcher, one contention being that the direction of the wound in the side and the range of the shot demonstrate that it could not have been done while the deceased was

retreating up the hill, or the wound would have been directly in the back, and that it could · only have been done when deceased was on the fence with his side turned to defendant. A survey was made of the premises, and we have the testimony of engineering experts that from the place where defendant was standing he could not have shot the deceased running up the hill, because of an intervening fence obstructing the view and the range of the shots. These witnesses also testify that the range of vision of the principal witness was obstructed by a building, so that the deceased could not have been seen by the witness when it is said the fatal shot was fired. On the other hand, the State insists that the· theory that deceased was shot while on the fence is contradicted by three eye-witnesses, and the shot in the rear of the leg shows it was made while deceased was retreating up the hill, and that the fatal shot was fired while deceased had his side somewhat turned to the defendant, as he attempted to get behind the house, and was so immediately fatal that the deceased could never have reached that point if the wound had been inflicted at the fence. It is not very definitely shown where defendant stood when he shot. That he did shoot five times there is no question, and he either shot at deceased as he ran, and because he saw him, or he aimed at the intervening fence, if he could not see him. Unquestionably one of the shots was fired while de-

ceased was retreating, and most probably both of them ·that took effect.

But, in any event, defendant cannot justify his action upon the ground of self-defense, even on his own theory. It is apparent there . was bad· blood between the young men, and they were ready to fight when occasion might offer. Defendant prepared himself for such an occasion and brought it about. He went by the place where deceased was, and called him to the road. Even on his own theory he was not in imminent danger. The deceased was in his shirt sleeves, and it was apparent to sight that he had no pistol on, . and at the most could have had but a knife. They were not in close quarters, so as to make the danger imminent. Defendant had a companion with him, while deceased was alone. Under these circumstances he was not justifiable in shooting when he says he did.

But we are satisfied that the version of the State in this matter . is correct, and that the shots were fired while deceased was in full retreat; they were continued as deceased fled up the hill, and the fatal shot was fired .while deceased was turning to get behind the barn and shelter himself. In that position he would have his side to defendant, and it is reasonable to infer that he would also have his body turned somewhat to look at his antagonist as he fled.

We are satisfied with the evidence. There is no error in the proceedings, and the judgment is affirmed.