### IN THE

# SUPREME COURT OF TENNESSEE

#### FOR THE

### EASTERN DIVISION.

---

### KNOXVILLE, SEPTEMBER TERM, 1921.

---

Hu M. JOHNSTON *v.* CINCINNATI, N. O. & T. P. RY. Co., *et al.*

(*Knoxville.* September Term, 1921.)

1. **JURY.** Repeal of statute allowing jury trial in chancery did not affect pending suits.

Acts 1919, chapter 90, section 1, repealing the provisions of the Code which gave a right to demand a jury in a chancery case, did not, in view of the second section of that act that every party thereto suing in the chancery court would be conclusively presumed to have waived a jury, and in view of Shannon's Code, section 61, providing that the repeal of the statute does not affect any accrued right, deprive a party to a suit in chancery instituted before the repealing act took effect of his right to trial by jury. (*Post, pp.* 145-147.)

Acts cited and construed: Acts 1919, ch. 90, sec. 1.

Case cited and approved: Wallace v. Goodlett, 104 Tenn., 685.

Case cited and distinguished: Lewis v. Mynatt, 105 Tenn., 514.

2. **FRAUDS, STATUTE OF.** Statute only applies to contract which by express understanding is not performable within a year.

(135)

The provision of the statute of frauds, requiring contracts not performable within a year to be in writing, extends only to contracts which, by express understanding of the parties, are not to be performed within the year. (*Post, p.* 147.)

Cases cited and approved: Railroad v. Staub, 75 Tenn., 397; Leinau v. Smart, 30 Tenn., 308; Railroad v. Hayden, 116 Tenn., 672.

3. **FRAUDS, STATUTE OF.** Evidence held not to show understanding that contract to grade railroad was not to be performed within year.

In an action on an oral modification of the contract for the grading of a railroad, evidence *held* not to show that the parties agreed that the modified contract was not to be performed within a year, though there was testimony it was not reasonably possible to do it, so that the contract was not invalid under the statute. (*Post, p.* 148.)

4. **RAILROADS.** Engineers of rilroad held authorized to make new agreement with contractor.

Where a contractor for railroad construction was seeking to abandon his contract because of the increased cost of the work, and was requested by the vice present of the railroad company to complete the contract and leave the estimate with the railroad engineers, whereupon the contractor was permitted to retire with the engineers and confer with them with regard to the proposition, and as a result of such conference agreed to go on with the work, the railroad company cannot contend that the engineers were not authorized to modify the contract. (*Post, pp.* 148, 149.)

5. **TRIAL.** Evidence construed most favorably to party against whom peremptory instruction is requested.

On motion for peremptory instruction, the entire evidence must be looked to, and it must be given the construction most favorable to the adverse party, and all reasonable inferences allowed in his favor, and the motion denied if there is then any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn therefrom. (*Post. pp.* 149-152.)

Cases cited and approved: Kinney v. Railroad Co., 116 Tenn., 451; Mayor, etc., v. Reece, 138 Tenn.. 479; Western Union Tel. Co. v. Lamb, 140 Tenn., 111.

6. **APPEAL AND ERROR.** Testimony as to witness' understanding of language used cannot be considered.

In determining defendant's right to a peremptory instruction that the oral contract claimed by plaintiff was not made, a statement by plaintiff's witness as to what he understood was meant by the language used by defendant's officer cannot be considered. (*Post, pp.* 152-155.)

7. **CONTRACTS.** Agreement to "classify" contractor's work differs from "estimate according to cost."

Testimony as to the modification of a contract for the construction of a railroad on which payments were to be made on the unit basis, so that the railroad engineers were to estimate the work according to cost, differs essentially from other testimony of the same witness they were to classify the work, since "estimating according to cost" means the issuance of estimates to the contractor calculated on the basis of cost, while to classify would mean to bring the different kinds of work under the heads or classes, and would be proper under a unit price contract, but meaningless with reference to an agreement to pay the cost of the work. (*Post, pp.* 155-157.)

Case cited and distinguished: Corbett v. Smith & Co., 101 Tenn., 374.

8. **TRIAL.** Unexplained contradiction in testimony of only witness to support contract held to warrant peremptory instruction against agreement.

Where the only evidence to support plaintiff's version of the contract was the testimony of an interested witness, who had also stated the contract in the terms claimed by defendant, a peremptory instruction for defendant should have been given. (*Post, pp.* 157, 158.)

Cases cited and approved: McLemore v. Railroad, 111 Tenn., 666; Harris v. Water & Light Co., 114 Tenn., 341.

9 **ESTOPPEL.** Litigant cannot take position inconsistent with former position deliberately taken.

A litigant who has deliberately taken one position will not, as a matter of law, be allowed to advantage himself by thereafter taking an inconsistent position either in the same or in another suit. (*Post, pp.* 159-161.)

Cases cited and distinguished: Hamilton v. Zimmerman, 37 Tenn., 48; Stamper v. Venable, 117 Tenn., 561; Stearns Coal & Lumber Co. v. Jamestown R. Co., 141 Tenn., 206.

10. **CONTRACTS.** Evidence aside from inconsistent testimony of witness held not to establish modified contract.

Where plaintiff claimed a railroad construction contract had been .modified to allow the contractor the cost of the work, instead of the unit price fixed by the contract, while the defendant claimed the only modification was an agreement to reclassify some of the work, evidence that the contractor in his correspondence referred to the reclassification agreed upon, and requested an allowance of the cost of the work, without then claiming a previous agreement to that effect, and stopped work when his request was refused, *held* not to support the contractor's testimony as to the terms of the contract, which was contradicted by other portions of his own testimony stating the terms as claimed by the defendant. (*Post, pp.* 161-163.)

11. **CONTRACTS.** Agreement held not to authorize use of contractor's equipment without compensation.

An agreement by a railroad company to advance money to its contractor, with the understanding that the contractor would allow his equipment to be used on the work until it was completed, does not entitle the railroad to use such equipment after the contractor abandoned his contract without paying compensation for such use. (*Post, pp.* 163, 164.)

12. **TROVER AND CONVERSION.** Bill seeking recovery of property and rental value waives conversion.

Where the receiver of a railroad contractor filed a bill against the railroad seeking to recover the property of the contractor used by the railroad in completing the work after it was abandoned by the contractor, and asking for the value of the hire and use of the

Johnston v. C., N. O. & T. P. Ry. Co.

property, he thereby waived his claim that the railroad had converted the property, and cannot recover its value. (*Post, pp* 164, 165.)

Case cited and distinguished: Bell v. Cummings, 35 Tenn., 286.

13. **TROVER AND CONVERSION.** Rental value and decrease in market value cannot both be recovered.

A receiver for a railroad contractor cannot recover from the railroad company which used the contractor's equipment after he abandoned the contract both the rental value of the use of the equipment and the decreased market value. (*Post, p.* 166.)

14. **DAMAGES.** Evidence held not to entitle contractor to recover for abuse of property used by railroad.

A receiver of a railroad contractor cannot recover from the railroad for the abuse of the contractor's equipment used by the railroad after the abandonment of the contract where the evidence is support of that item was meager, and the chancellor granted a liberal rental for the use of the equipment, which was all that the bill prayed for. (*Post, p.* 166.)

15. **INTEREST.** Allowance on recovery from date of suit is within chancellor's discretion.

The allowance of interest on recovery of the amount due a railroad contractor on modified agreement, and for use of his equipment from the filing of the bill, was a matter resting primarily in the chancellor's discretion. (*Post, pp.* 166, 167.)

16. **INTEREST.** Allowance of interest on recovery for admitted liability held proper.

Where defendants acknowledged their liability for a portion of plaintiff's claim, but made no tender or offer to pay, because they filed a cross-complaint, which, however, they abandoned when it was dismissed by the chancellor, the allowance of interest from the date of filing the bill was a proper exercise of the chancellor's discretion. (*Post, p.* 167.)

17. **RAILROADS.** Company held not liable for contractor's work under director general.

Where a railroad was under the control of the director general at the time a modified agreement with a contractor for construction

was made, and during the time of the performance of such agreement by the contractor and by the railroad after his abandonment, the railroad company was not liable for the amount due the contractor under the modified agreement, or the rental value of the equipment used in completing the contract after its abandonment  (*Post, p.* 167.)

Cases cited and approved: Memphis Union Station Co. v. Manning, 144 Tenn., 640.

## FROM SCOTT.

Appeal from the Chancery Court of Scott County.—HON. JOHN JENNINGS, JR., Chancellor.

H. B. LINDSAY and J. H. FRANTZ, for appellant.

S. R. PRINCE, L. D. SMITH, and H. M. CARR, for appellees.

MR. CHAS. C. TRABUE, Special Judge, delivered the opinion of the Court.

H. H. Thrasher is a railroad contractor in Knoxville. A general creditors' bill was filed against him, and Hu M. Johnston, complainant, was appointed receiver of his property and assets, and in that capacity brought this suit against the Cincinnati, New Orleans & Texas Pacific Railway Company and the Director General of Railroads to recover a balance alleged to be owing Thrasher under a construction contract, and a further sum for the alleged wrongful use of Thrasher's equipment and supplies. There was a decree below for $118,594.36 with interest from the filing of the bill, and both sides appealed.

On June 27, 1917, Thrasher entered into a contract with the railroad company to construct ten and six-tenths miles of railroad in Morgan county on a unit price basis; that is to say, he was to be paid different unit prices for earth, loose rock, soft rock, and hard rock. War conditions and other circumstances caused the contract to become very burdensome, and in January, 1918, Thrasher went to Washington with Judge Lindsay, one of the attorneys representing him in this suit, and announced to Mr. Spencer, vice-president of the railroad, that he could not go on under existing conditions, and had determined to abandon the contract.

The present suit is not based on the original contract, but on a new agreement alleged to have been entered into orally on the occasion of this visit of Thrasher in Washington, by which new agreement it is claimed that the road bound itself to pay Thrasher the cost of the work from its beginning until its completion.

When complainant filed his bill in this cause he based his claim to a recovery on two grounds: First, upon an alleged custom of the defendant railroad company to pay all contractors for construction work who might be losing money on their contracts the cost of the work plus a reasonable profit; and, second, upon the alleged oral agreement of January, 1918, to pay him actual cost—and in his prayer he asked to be allowed the actual cost, "together with a reasonable profit." However, there was no proof in support of the alleged custom to pay cost and profit, and that ground of the bill was abandoned. Later complainant, in his answer to a cross-bill in the cause, stated that the oral agreement of January was "to allow him cost and profit," but nothing was shown in the proof to have been said

Johnston v. C., N. O. & T. P. Ry. Co.

about any profit, and the suit at last resolved itself into one of whether defendants had agreed to pay him actual cost.

Defendants likewise claimed that an oral agreement was had in Washington at that time, but they denied that it was an agreement to pay cost; and the question of what that oral agreement was is the fundamental question in the case.

There were present at this conference in Washington Mr. Thrasher and his attorney on the one side, and on the other Mr. Spencer and his chief engineer of construction, Mr. Wells, and assistant chief engineer, Mr. Durham. After some discussion Mr. Spencer asked Mr. Thrasher to make him a definite proposition, and Mr. Thrasher and his attorney withdrew and prepared and submitted to Mr. Spencer a letter containing several propositions looking to the completion of the work. When they came back the next day Mr. Spencer declined these propositions, and there was a general discussion, in which complainant's attorney stated that complainant was having to remove a large quantity of material, such as blue slate, which was classed under his contract as soft rock, with a twenty-eight-cent unit price, but which was as hard and expensive to remove as hard rock, and should, he claimed, be classed as hard rock with a sixty-cent unit price.

Mr. Spencer asked his engineers if this was so, and they answered in the affirmative, and thereupon he stated that he would like to confer with them privately. After this conference, and when the parties again came together, Mr. Spencer stated that he thought complainant ought to go on with the work and leave the matter to the engineers; whereupon complainant's attorney asked that he and com-

plainant be permitted to talk privately with the engineers, and the four of them retired to an anteroom for that purpose.

Up to this point both sides agree about what occurred, and they further agree that, in the meeting that then ensued of the two engineers and Thrasher and his attorney, an understanding was reached. Thrasher and his attorney say that they asked Wells, the chief engineer, what Mr. Spencer meant by his suggestion that the matter should be left to the engineers, and that Wells replied that Spencer had authorized him to classify or estimate the materials according to cost, which meant, they say, that the railroad would pay the actual cost of the work; and they go on to say that, after this agreement was reached, they went back into Mr. Spencer's room and told him that, since talking with the engineers, Thrasher was willing to go on with the work.

On the other side, Wells had died, so that the only witness was Durham. He testifies that, when the engineers met with Thrasher and his attorney in Mr. Spencer's anteroom, Wells, the chief engineer, stated to Thrasher that the railroad was willing to reclassify the blue slate as hard rock from the beginning, and to pay hard rock prices for it; and he says that this was assented to by Thrasher, and that this was the agreement and the only agreement that was made.

A singular thing is that the agreement, which on either theory involved an increase of probably over $100,000, was not put in writing then or thereafter. Nor were the terms of it repeated in Mr. Spencer's presence when the parties came back into his office.

Complainant asked for a jury, and the parties formulated a large number of issues, which were reduced by the chancellor to four, and these four issues were without objection submitted to and determined by the jury. The first issue was whether the agreement of January 5th was, as contended for by complainant, "to pay H. H. Thrasher actual cost for the work already done and to be done," and the jury answered this in the affirmative; the second issue was whether that agreement was, as contended for by the railroad, namely, to "classify all material which was as expensive to move as solid rock and pay the contract price of solid rock therefor," and the jury answered this issue in the negative.

Defendants asked for a peremptory instruction in their favor upon both of these issues, but their request was refused, and this refusal is made the basis of one of their principal assignments of error in this court.

After the jury had thus determined that the railroad had bound itself to pay actual cost (and both sides agreed that the understanding then had was to govern and be effective from the very beginning of the contract in May, 1917) the chancellor directed a reference to the master to take and state an account.

Thrasher had gone on with the work from the time of the new agreement in January, 1918, until September 30, 1918, at which time he had abandoned the work altogether, and his equipment and supplies had been taken over by defendants for the purpose of completing the work, and some six or seven months later had been returned to Thrasher or his receiver.

Accordingly the reference to the master was divided into two heads, the first having to do with determining the amount owing Thrasher for work done by him up to the

time he abandoned the contract on September 30, 1918, and the second having to do with determining the amount owing Thrasher by reason of the use by the railroad of his equipment and supplies on and after September 30th. The determination of the amount owing him under the first head was to be on the basis, as found by the jury, of paying him "actual cost."

Proof was taken on this reference, and a report was filed by the special master, and exceptions were taken by both sides. The chancellor allowed some exceptions and disallowed others, the following being a summary of his decision as embraced in the final decree.

Owing Thrasher under contract to pay cost up to September 30, 1918:

| | | |
|---|---|---|
| Balance due on payroll, etc...... | $20,227.71 | |
| For Thrasher's personal services.. | 6,400.00 | |
| For rental of his equipment..... | 40,800.00 | $ 67,427.71 |

Owing Trasher for use by railroad of his equipment and supplies after September 30, 1918:

| | | |
|---|---|---|
| Value of material not returned.. | $24,766.65 | |
| | | $118,594.36 |
| Rental of equipment returned... | 26,400.00 | 51,166.65 |

1. It is first objected by defendants that the right to a jury trial in this case was taken away by section 1 of chapter 90 of the Acts of 1919, repealing those provisions of the Code that gave either party in a chancery case the right to demand a jury.

The bill in this case was filed in January, 1919, and the repealing act took effect in April of that year, and the case was tried before a jury in the following August. Defendants did not object to the jury or to the issues that were submitted to the jury, but raised this question for the first time after the verdict was rendered.

If a jury trial was improper in this case, the question would arise of whether defendants could acquiesce in such a trial and then afterwards allege error on that account; but it is unnecessary to decide that question for the reason that complainant was manifestly entitled to a jury trial.

The first section of the act of 1919 does abolish the jury statutes without more, but the second section provides that "Every party hereafter suing in the chancery court" upon a cause of action of which the chancery court has concurrent jurisdiction will be conclusively presumed to have waived the right to a jury trial. So that the reasonable inference is that, while the legislature intended that jury trials should be abolished as to all parties thereafter coming into the chancery court, since they would be put on notice and would have their election to sue at law, it did not intend to take away the right to a jury trial from those who had previously brought suits in the chancery courts; and this intention should be and will be given effect by treating the repeal of the jury statutes in the first section as affecting only the rights of parties thereafter suing in the chancery court. This is in conformity with the rule that all of the words of a statute should be construed together (*Lewis* v. *Mynatt,* 105 Tenn., 514,, 58 S. W., 857) and with the rule of construction declared in section 61 of Shannon's Code, viz.:

"The repeal of a statute does not affect any right which accrued, any duty imposed, any penalty incurred, nor any proceeding commenced, under or by virtue of the statute repealed."

This statute was held in *Wallace* v. *Goodlett,* 104 Tenn., 685, 58 S. W., 343, to save the right to a particular remedy.

2. During the trial defendants amended their answer so as to plead the statute of frauds upon the ground that the alleged oral contract sued on by complainants "was not to be performed within the space of one year from the making thereof;" and it was sought to support this defense by showing that neither party expected that the contract would be completed within a year.

The evidence, however, is not, in our opinion, sufficient. Durham, the railroad's witness, testified that it was not "reasonably possible" to move in a year the quantity of material that was to be moved, while Thrasher at first stated that, if some unforeseen trouble had not come up, he would have completed the work in September, a period of eight or nine months, then later on testified:

"I knew I couldn't do it in a year, and I didn't tell them I could, and I didn't sign a contract to do it, either."

There is no explanation of this contradiction except that he was being cross-examined, and seems to have been in the mental attitude that that sometimes induces.

This court has frequently held that the statute only extends to contracts in which, by express appointment or understanding of the parties, the thing is not to be performed within a year. *Railroad* v. *Staub,* 7 Lea, 397; *Leinau* v. *Smart,* 11 Humph., 308; *Railroad* v. *Hayden,* 116 Tenn., 672, 94 S. W., 940.

In our opinion the "understanding" that the contract is not to be performed within a year is not sufficiently shown by the mere testimony of the interested parties, when they come into court long after, that either one or both did or did not contemplate that it would take more than a year, but it must appear either from the inherent nature of the contract, or from the words or actions of the parties at the time, that such an understanding was a part and parcel of the agreement itself.

We do not think that the evidence shows any actual understanding at the time that the contract was not to be performed in a year, nor do we think that such an understanding can properly be inferred from the inherent nature of the contract. The first agreement was entered into in May, 1917, and was by its terms to be completed within the maximum period of fifteen months. Thrasher had already been engaged in the performance of that contract over seven months at the time the new agreement was made in January, 1918, so that it is reasonable to suppose that the contract could have been completed within a year from the time the new agreement was entered into. It was a matter of men and equipment.

3. Again it is contended by defendants that the evidence fails to show that an agreement was entered into by any one authorized on the part of defendants to make it. It certainly was done in a peculiar way. Mr. Spencer talked privately with his engineers, then suggested to Thrasher that the matter be left to the engineers, then sent Thrasher out to talk with the engineers, and finally allowed the parties to disperse without himself having any understanding with them, and this not because there was

no agreement in his anteroom, but for some reason that is not clearly explained in this record.

The matter could hardly have been contrived more unsatisfactorily, but defendants contributed their part to make it so, and we do not think, under these circumstances, that they can complain that the engineers to whom Mr. Spencer referred Thrasher for an understanding were without authority to make the agreement.

4. The principal question, and the one that has given us the most difficulty, arises upon the assignments of error of defendants that complain of the chancellor's refusal to peremptorily instruct the jury upon the first and second issues. These issues presented the respective contentions of complainant and defendants as to the terms of the agreement, and the finding of the jury was in favor of complainant's contention and against that of defendants.

It has been established by repeated decisions of this court that, upon a motion for peremptory instructions, the entire evidence must be looked to, and that it must be given the construction most favorable to the adversary party, and all reasonable inferences allowed in his favor, and that, if there is then seen to be a dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion should be denied. *Kinney* v. *Railroad Co.*, 116 Tenn., 451, 92 S. W., 1116; *Mayor etc.*, v. *Reece*, 138 Tenn., 479, 197 S. W., 492, L. R. A., 1918B, 349; *Western Union Tel. Co.* v. *Lamb*, 140 Tenn., 111, 203 S. W., 752.

The issues here involved, together with the answers of the jury thereto, were as follows:

"(1) Was there a verbal agreement entered into on January 5, 1918, between the C., N. O. & T. P. Ry. Co.

and H. H. Thrasher by which the railway company agreed to pay H. H. Thrasher actual cost for the work already done and to be done?

"Yes.

"(2) Was there a verbal agreement entered into between H. H. Thrasher and the C., N. O. & T. P. Ry. Co. on January 5, 1918, by which the railway company agreed that it would in the classification of material moved and to be moved classify all material which was as expensive to move as solid rock and pay the contract price of solid rock therefor whether the said material fell within that classification under the original specifications or not?

"No."

The motion, therefore, for a peremptory instruction upon the first issue presents the question of whether, upon taking that view of the proof most favorable to complainant, there is material determinative evidence to show an agreement to pay actual cost. If there is, then the chancellor properly refused the motion; otherwise it should have been allowed.

The circumstances and surroundings under which the new agreement was reached have already been stated. There is no controversy about them. It was arrived at in an interview in Washington between the complainant and his attorney on the one side and Wells, defendant's chief engineer of construction, and his assistant, Durham, on the other. The controversy is, as stated, over the terms or language of the agreement, and as to that complainant testified on his direct examination as follows:

"Mr. Wells and Mr. Durham, Judge Lindsay and myself went into an adjoining room, and Judge Lindsay asked Mr. Wells, he says, 'What do you understand Mr. Spencer

to mean by saying, "Leave it to the engineers?"' He said, 'I understand by that that the bridle is off and that we can estimate this work according to cost.' Judge Lindsay then said to him, 'Will you do that, Mr. Wells?' and he said, 'We will, won't we, Durham?' Durham says, 'we will if you want us to; you are the chief engineer; I am only the assistant.' Then he says, 'I say so,' and upon that conclusion we went back into the room where Mr. Spencer was and told him, after talking to his engineers, with his engineers, that we had decided to go on with the work."

Complainant here stated the agreement to be to "estimate this work according to cost." In the original bill the agreement had been stated to be "to classify the materials according to cost," and complainant was interrogated about this on cross-examination as follows:

"Q. Referring to the conversation that you had with Mr. Durham and Mr. Wells, the bill states as follows: 'Thereupon the said W. H. Wells stated to the said Thrasher and to the said Lindsay that Mr. Spencer had taken the bridle off of them, the engineers, and instructed them to classify the material moved by the said contractor according to cost.' Is that your recollection of it?

"A. Yes; substantially so.

"Q. It then goes on: 'And the said Wells turned to the said Durham, who was present and heard the above declaration made to the said Thrasher and Lindsay, and said to the said Durham, "You understand that you are to classify the material according to cost."' Is that your recollection?

"A. That is the substance of it; maybe a word or two changed; I don't know about that; but that is the sum and substance of it; that is just about what he said."

The variation between the word "classify" as used in the bill and the word "estimate" as testified to by complainant was then called to his attention:

"Q. . . . You say now that he said he would estimate according to cost?

"A. Yes; that is my recollection.

"Q. He didn't say classify?

"A. No, sir; I think he said 'estimate;' that is my recollection of what I think he said.

"Q. When you put this in that bill, and swore to it, it was fresh in your memory then?

"A. My attorney wrote the bill. I signed it.

"Q. He was present at the meeting, and was he the same attorney who wrote the bill?

"A. Yes, sir.

"Q. What you say now, which is correct, as stated in the bill, or as you now state it?

"A. I still think that he said 'estimate according to cost.' I am of that opinion: It is very firmly fixed in my mind.

"Q. If you understood it 'estimate according to cost,' and your attorney, who was present, 'classify according to cost,' your own minds don't agree on what was said?

"A. I don't know about that."

Complainant went on to say that he understood the language used by Wells to mean that defendants would pay the actual cost of the work, but upon this review of the evidence we must, of course, confine ourselves to the facts, that is, to what was actually said and done by the parties.

After the question had thus arisen on complainant's cross-examination of whether the agreement was to "classify" or to "estimate," and complainant had given his

recollection in favor of the word "estimate," the bill was amended so as to state the agreement as embodying both words in the alternative, viz. "to classify or estimate the materials according to cost."

Further on in his cross-examination complainant testified as follows:

"Q. Well, up to the time you quit had you not received all the money that was due you from the railroad under your contract of January 5, 1918, if that contract was to pay you the hard rock price for any rock that was as expensive to move as hard rock; if that had been the contract, would you not have received pay in accordance therewith at the time you quit?

"A. I don't know; they had not classified it that way previous to January 5th.

"Q. It had not been classified that way previous to January 5th?

"A. No, sir; they promised to do so, but never did it, and we always contended that was the trouble; they would not go and reclassify the work as they had agreed to do.

"Q. They did agree to reclassify the work?

"A. Yes, sir.

"Q. And pay you hard rock prices for it—for all material that was as difficult to move as hard rock?

'A. Yes; that was the agreement there with Mr. Spencer on January 5th.

"Q. And if they had done that you would have not had any complaint?

"A. I don't think I would. . . ."

This was an explicit statement by complainant that "the agreement there with Mr. Spencer of January 5th"— that is, the agreement in controversy—was "to reclassify

the work" and to pay "hard rock prices . . . for all material that was as difficult to remove as hard rock," terms which exactly corresponded with the contention of defendants, and which to that extent contradicted the contention of complainant that he was to receive cost. Complainant was immediately re-examined on this subject by his own attorney as follows:

"Q. I want to get, Mr. Thrasher, with reference to this last subject-matter asked about on re-examination, to re-examine you on that first. Now what was the agreement entered into with the engineers with reference to or as to what sort of an estimate or classification you were to be given for work done previous to January 5th? Just state what the agreement was?

"A. The agreement was that they would go back and reclassify that work and bring it all up to date.

"Q. What sort of prices were they going to fix on it?

"A. They were going to bring it up to solid rock."

The witness here reiterated that the agreement was to "reclassify" the work, and, in answer to the question of "what sort of price" he was to receive, said again that "they were going to bring it up to solid rock." His reexamination proceeded:

"Q. Then what sort of price would be put on the solid rock up to that date?

"A. The cost of the work from the beginning on.

"Q. Were they to be limited as to contract prices in fixing what the cost would be?

"A. It is not my understanding.

"Q. Then, when they say they were to classify the material as solid rock that was as expensive to move as solid rock, did they limit the price under that agreement to

what the contract said it was or what it might cost you?

"A. What it might cost."

It is not clear whether the witness was in this last excerpt testifying as to the agreed terms of the contract or as to certain inferences of his own, but we will on this motion treat it as being of the former character, so that it comes to this: That the material was to be reclassified so as to bring it up to solid rock, and that, when this was done, the price to be paid was to be "the cost of the work," which, of course, would mean that it was not to be on the basis of the reclassification.

Complainant's attorney testified about the terms of the agreement as follows:

"Mr. Wells said, 'The work will be estimated or classified' (I don't recall which; I did not appreciate the difference in the two expressions then) 'according to cost, won't it, Mr. Durham?' Mr. Durham says, 'It will if you say so; you are the chief engineer.' "

Wells had died, so that the only other witness as to the actual terms of the agreement was Durham, and the substance of his testimony has heretofore been stated. He was a witness for defendant, and testified to the terms as contended for by defendants, so that his testimony affords no evidence whatever of an agreement to pay cost. The evidence of such an agreement, if it exists, must be found in the testimony of complainant or his attorney.

In order to determine intelligently whether there is such evidence, it is of some importance to get an understanding of whether and to what extent there is any variance in meaning in the two words "classify" and "estimate" as used in a contract of this character. It will be recalled that the bill first averred that the agreement was "to classify

the material according to cost," and that complainant testified that his best recollection was that the word was "estimate," and not "classify," and that his attorney testified that he could not recall whether it was the one or the other.

It is apparent that the two words are not of similar meaning in an agreement of this kind, for, while one may "estimate materials according to cost" in the sense of issuing, say, monthly estimates to the contractor, calculated on the basis of cost, and may likewise "classify materials" according to their character, as, for instance, in order to bring them under the heads or classes of dirt, or loose rock, or soft rock, or hard rock, as in the original contract between these parties, it is not perceivable, nor is it explained in the record, how such materials could be "classified according to cost." The point in this that is especially relevant to this inquiry is that, while a classification of the materials is the very basis of a unit price contract, it does not seem to have any place at all in a contract to pay cost, since the essence of cost is its variability.

So that, when we regard the sense and meaning of the words, it is seen that the same materials could not be paid for on both a cost and a classification basis, since the two are quite different, and that therefore the real question between the parties was whether the new agreement was upon a cost basis or upon a basis of classifying or reclassifying the materials. Upon that issue the proof of complainant's attorney was negative, for he is unable to recall whether the determinative word was "classify" or "estimate," although these words are, as we have seen, of quite dissimilar significance in a contract of this character.

Now how is the situation different with complainant, who first testified to an agreement to pay cost, and then testified with equal positiveness to an agreement to reclassify the materials so as to pay hard rock prices for materials as difficult to remove as hard rock; who in effect contradicted himself? Would it be just and sensible for a court to take a portion of his testimony and disregard the conflicting portion, although no excuse or explanation of the conflict is given, and to say that the former affords the necessary modicum of proof to go to the jury?

The rule is otherwise, for, while complainant is entitled upon motion for a peremptory instruction to the most favorable view that can reasonably be taken of the evidence, the rule, as will be seen from the cases heretofore cited, has reference to the whole evidence, and not to some part of it. It is the same in this respect as upon a demurrer to the evidence, with regard to which it was said in *Corbett* v. *Smith & Co.*, 101 Tenn., 374, 47 S. W., 695.

"It is said if the evidence is conflicting, only that must be looked to which is most favorable to plaintiff, on demurrer to evidence. This is not a correct statement. The evidence must be looked to as a whole, and all reasonable inferences drawn from it in plaintiff's favor, but none of it must be excluded simply because unfavorable, but only if shown by other evidence to be incorrect."

The testimony of a witness as to a particular fact may have value even though he has both affirmed and denied it if the contradiction is explained and is shown to have been the result of misunderstanding or inadvertence. *McLemore* v. *Railroad*, 111 Tenn., 666, 69 S. W., 338; *Harris* v. *Water & Light Co.*, 114 Tenn., 341, 85 S. W., 897. But it is a very different matter for an intelligent witness, a

man of mature years and of large business experience, to contradict himself, and this without explanation, as to the vital terms of the very agreement upon which he sues, to exhibit, as complainant does here, his uncertainty, to say the least of it, of whether the contract was his way or his adversary's.

The extent of this contradiction or inconsistency in complainant's testimony has not been fully shown in the references above. There were only the two kinds of contract contended for, so that each testimony or admission by him of an agreement to reclassify contradicted his claim of an agreement to pay cost, and yet complainant, although he had said that the agreement was to "estimate" and not to "classify," repeatedly referred to the agreement as an agreement to classify or reclassify. Thus he says:

"They had agreed to reclassify our work;" "they promised to reclassify the work;" "they had promised us to reclassify the work," etc.—and a few weeks after the agreement was made he wrote Mr. Spencer: "I am sure that when my work is reclassified according to the spirit of our understanding this will afford me considerable relief."

The question here is not one of the credibility of a witness or of the weight of evidence; but it is whether there is any evidence at all to prove the fact. If two witnesses contradict each other, there is proof on both sides, and it is for the jury to say where the truth lies; but if the proof of a fact lies wholly with one witness, and he both affirms and denies it, and there is no explanation, it cannot stand otherwise than unproven. For his testimony to prove it is no stronger than his testimony to disprove it, and it would be mere caprice in a jury upon such evidence to decide it either way.

In *Hamilton* v. *Zimmerman,* 5 Sneed, 48, Judge McKIN-NEY said that— "The doctrine of estoppel, which, from motives of public policy or expediency, will not, in some instances, suffer a man to contradict or gainsay, what, under particular circumstances, he may have previously said or done . . . . applies with peculiar force, to admissions or statements made under the sanction of an oath, in the course of judicial proceedings."

In that case the court held that, in consequence of complainant's admission in his pleading in a former case that he was defendant's clerk, he was then precluded from claiming that he was defendant's partner.

In *Stamper* v. *Venable,* 117 Tenn., 561, 97 S. W., 813, it was held that one whose suit was brought on the theory that an instrument was a deed could not in the course of the suit be heard to claim that it was a will. The court quoted from Bigelow on Estoppel as follows:

"If parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed. The coercive powers of the law, available only between those who consented to its exercise, could be set at naught by all. But the rights of all men are in the keeping of the courts, and consistency of proceeding is therefore required of all those who come in or are brought before them. It may accordingly be laid down as a broad proposition that one, without mistake induced by the opposite party, who has taken a particular position deliberately, in the course of litigation, must act consistently with it. One cannot play fast and loose."

And in the very recent case of *Stearns Coal & Lumber Co.* v. *Jamestown R. Co.,* 141 Tenn., 206, 208 S. W., 334, this court said:

"While the law of judicial estoppel is ordinarily applied to one who has made oath to a state of facts in a former judicial proceeding which in a later proceeding he undertakes to contradict, yet it is frequently applied, where no oath is involved, to one who undertakes to maintain inconsistent positions in a judicial proceeding."

The principle underlying these decisions runs throughout the administration of justice, and is that a litigant who has deliberately taken a position will not as a matter of law be allowed to advantage himself by taking an inconsistent one either in the same or in another suit.

To restate the matter: Complainant testified that the contract was to pay cost, and then that the contract was to reclassify the materials on a hard rock basis, and offered no explanation of this inconsistency that would enable a court or jury to decide between the two statements. Is this any evidence at all of an agreement to pay cost? If a plaintiff should testify with equal positiveness that defendant stole his horse and that some third person stole his horse, no one would doubt that the case ought not to go to the jury.

We are constrained, therefore, to conclude that there was no evidence to prove a contract to pay cost, and that the jury should have been instructed to answer the first issue in the negative. And for the same reason the jury should have been instructed to answer the second issue in the affirmative; for that issue presented defendant's contention as to the terms of the contract, and was in a sense alternative. The contract in that form was proven by Durham and supported by a number of corroborating facts and circumstances, some of which are mentioned in the course of this opinion; and the only testimony in opposition was

that undertaking to establish an agreement to pay cost. Since we have found that there was no evidence to support a contract to pay cost, it results that there was none in opposition to the contract as proven by Durham.

We wish to add that we have searched complainant's testimony for an explanation of its inconsistencies that would entitle it, upon grounds of inadvertence or mistake, to some weight on the side of the jury's verdict upon these two issues, but could find none, and that, when for this purpose we went outside of his testimony and looked to his conduct and correspondence before the present difference arose, the impossibility of any such explanation was only emphasized.

We have heretofore referred to his letter to Mr. Spencer written a few weeks after the new agreement was made, in which he referred to it as one in which his work was to be "reclassified according to the spirit of our understanding." Two months after the agreement was made he wrote Mr. Spencer proposing "by way of compromise" to "accept actual cost of all moneys expended in the prosecution of said work to date." Mr. Spencer in his answer declined to consider the proposal, and stated that he was not advised of any dispute over the contract that required a compromise, adding: "The contract is clear in its meaning, and we consider it is in full force and effect." Complainant acknowledged the letter, and stated that there were several things that would have to be adjusted in the end, but again made no claim to any existing agreement to pay cost.

Other letters were written by complainant to the railroad in the months that followed, in which he complained of the financial difficulties he was in and of the cost of the work exceeding the estimates he was receiving from

146 Tenn.—11

the railroad, but in none of them was there a statement or a suggestion that the railroad had agreed to pay him cost. The only work during this time for which he was paid on a cost basis was certain concrete, and this was by virtue of a special agreement covering that matter. In September complainant asked that his unit prices be increased, and this was taken up and discussed and the request was refused; and again there was no claim of a contract to pay cost. During the nine months after the January agreement was made that complainant remained on the work all of the estimates were issued and payments made to him on the basis of classifying all of the materials as hard rock and at hard rock prices, and these estimates were receipted by him.

In the latter part of September complainant quit. In his letter announcing this decision he stated that he had just been advised that defendant had refused to "increase the unit price for doing this work over that fixed in the contract;" and he went on to say that he was financially unable to proceed, as the cost of doing the work had so far exceeded the sums paid him, but he made no claim that the railroad had agreed to pay him cost, or that it had breached its agreement in any respect.

It results that the decision below was on the wrong basis. The liability of defendants up to September 30, 1918, when complainant quit the work, should be determined on the basis of reclassifying the materials from the beginning of the work so as to classify as hard rock and to pay hard rock prices for all materials that were as difficult to remove as hard rock. The cause will be remanded for that purpose.

5. On October 1, 1918, Thrasher abandoned the contract, and his equipment and supplies were taken over and

used in the completion of the work, and when thereafter they were returned to Thrasher's receiver the commissary supplies of about $10,000 had been consumed, and other property of Thrasher of considerable value was missing. The chancellor held that defendants were liable for the value of the property not returned, and for rental of the equipment that was returned, and, while both sides object here to the amounts allowed, they represent substantially the concurrent findings of the master and chancellor, and we find no sufficient reason to disturb them.

However, both sides object to the basis of this recovery, and this remains to be discussed. Defendants admit liability for the property that was not returned, but claim that they had the right to use the equipment, and that they are not liable on any account for the use of it; and they base this contention on the circumstance that shortly after the new agreement of January, 1918, was made the railroad loaned Thrasher $30,000 upon the express written agreement that his outfit then employed on the work should remain on the work and be available for use until all of the work was completed. Defendants accordingly insist that, when Thrasher abandoned the work on October 1, 1918, they were entitled, under the above agreement, to take over and use his equipment in order to complete the work, and to do this without liability on their part.

The agreement referred to was in a letter from Mr. Spencer to complainant of February 4th, in which Mr. Spencer stated that the railroad would make an advance of $30,000 to complainant—"upon the condition that your outfit, machinery, tools and equipment now employed on the work, covered by the contract shall and may be kept and will re-

main on the work available for use until the completion of the work contemplated by the contract," etc.

It was probably the intention of this agreement that, if complainant abandoned the work, the railroad should have the right to use his equipment to complete it, but it seems to us to afford no basis whatever for the claim that complainant was to have no compensation for its use. If this suit presented a claim by defendants for damages for breach of contract, it might be proper to set off any recovery under that claim against complainant's claim to compensation for the use of this equipment, but we have not to deal with that, as no claim for breach of contract is now presented in this record.

6. What, then, is the proper measure of Thrasher's recovery for the use of this equipment? It is strongly insisted in his behalf that defendants were guilty of a conversion, and that they are responsible for the value of the equipment and supplies at the time they were taken over on October 1, 1918; but this claim is concluded against him both by the pleadings and by the subsequent act of his receiver. The bill filed by his receiver states that his equipment had wrongfully been taken possession of by defendant on October 1, 1918, and that some of it "has probably been used or consumed . . . and that the defendants are liable for the value of all of said property which they have used, consumed, or destroyed, possession of which cannot be delivered to complainant;" and the prayer is that complainant be given "the immediate and exclusive possession" of the equipment and supplies and a decree 'for the value of the hire and use of said property while so detained from him."

A month or two after the bill was filed such of the property as had not been consumed or destroyed was turned back to and accepted by Thrasher's receiver.

It is therefore manifest that, if the facts would have sustained a claim of conversion, which it is not necessary to decide, complainant in his bill elected to waive that claim by alleging his own ownership of the property, and asking for its return and for rental or hire for its use, and that this election was even more definitely exercised when shortly thereafter the receiver accepted back the property from defendants and proceeded to dispose of it as assets of Thrasher.

The principle that is applicable is thus stated by Judge CARUTHERS in *Bell* v. *Cummings*, 3 Sneed, 286:

"Now, any act, or course of conduct, on the part of the latter [that is, the owner] with full knowledge of what has transpired, which goes to sanction the act, or which indicates that he still claims to be owner, would amount to a waiver of the tort, and his right to recover the value as for a conversion, and leave him only a right to resort to an action on the case, in which the injury done by the tort, if any, could only be recovered, without a change of the property."

This case was one of the hiring of a slave, and the claim was made that the bailee had converted it, and the court went on to say:

"If the slave be taken back, at or before, the expiration of the term of hire, or if the hirer, in any other way assumed to be and held himself out as owner, after knowledge of such conversion, as if by the contract he was to furnish the necessary clothing, which he continued to do, subsequently, he could not maintain trover and recover the value."

7. Another assignment of complainant insists that he is entitled to recover on account of this equipment an amount equal to the decrease in its market value between the time it was taken over and the time it was returned. Such a recovery, designed to give complainant the equivalent of its market value at the time the property was taken over, would be only another way of recovering as for a conversion, which, as we have seen, complainant cannot do. Manifestly he could not have this and rental too, and, since he sued for rental, and since the item allowed for rental is larger than the amount sought under this head, the allowance of the former meets all of the requirements of the situation.

We accordingly conclude that the chancellor was correct in giving complainant the value of the property that was not returned and rental of the equipment that was returned; and since, as stated, the chancellor virtually concurred with the master in the amounts allowed under these items, we approve and allow these recoveries as proper.

8. It is further insisted by complainant that he is entitled to an additional item of about $20,000 for alleged damage to the property returned resulting from its abuse by defendants. The evidence in support of this item was meager, and the prayer of the bill in this respect was only for the value of the "hire and use" of the property, which would clearly mean its rental value. The chancellor accordingly disallowed this claim, but granted Thrasher a liberal rental for the use of the equipment, which we think sufficiently meets the equities of the case.

9. The result is that we affirm the decree of the chancellor for $51,166.65 for the rental of the equipment after September 30, 1918, and for the value of the material not

returned. The chancellor allowed interest from the filing of the bill. This was a matter that rested primarily in his discretion, and we are not disposed to disturb his exercise of it in this instance.

As stated above, the defendants were clearly liable for these rentals, and for the value of the property taken and consumed by them. In fact, they acknowledged this liability in their answer, but made no tender or offer to pay on the ground that they had a cross-claim against complainant. They proceeded then to file a cross-bill claiming a large recovery, but, when this cross-bill was later dismissed, they abandoned it and have assigned no error on that account in this court. We feel that upon equitable considerations this presents a proper case for the allowance of interest.

10. The chancellor rendered a joint judgment against the railroad company and the director general, and it is objected by the railroad company that no judgment should have been rendered against it. In this we think it is correct. The railroad was under federal control from December 28, 1917, until March 1, 1920, and it was during that period that this new agreement was made and performed, and that Thrasher's equipment was taken possession of and used. See *Memphis Union Station Co.* v. *Manning*, 144 Tenn., 640, 234 S. W., 756.

While we have spoken of the agreement of January 5, 1918, as a new agreement, it was in fact but a modification of the original agreement between the parties for the purpose of classifying as hard rock and paying hard rock prices for material that was as difficult and expensive to remove as hard rock; the original agreement in all other respects being unaffected by such modification and continuing in full force and operation.