## State *v.* Davis.

### (*Jackson.* April 29, 1900.)

1. MURDER. *Verdict for murder in second degree supported by facts.*

   The Court holds that the facts set out in the opinion sustains a verdict of murder in second degree, with sentence of fifteen years, against the defense of accidental killing. (*Post, pp. 502–506.*)

2. EVIDENCE. *In rebuttal.*

   Defendant's statement of a confessional character, which he denied on cross-examination, is admissible in rebuttal to impeach his testimony, although it could have been introduced as evidence in chief to prove his guilt. (*Post, pp. 506, 507, 509.*)

3. SAME. *Not part of conversation.*

   The defendant is not entitled to explain a confessional statement proved by the State by proof of a subsequent distinct conversation, although the times and places of the two conversations are not far removed from each other. (*Post, pp. 506–509.*)

4. SAME. *Res gestæ.*

   A self-serving statement, made by defendant so long after the criminal act as not to constitute part of the *res gestæ*, is not admissible in his behalf. (*Post, pp. 506–509.*)

   Cases cited: Nelson *v.* State, 2 Swan, 257; Mayfield *v.* State, 101 Tenn., 676.

5. CHARGE OF COURT. *Failure to charge as to self-defense.*

   It is not error for the Court to omit, on the trial of a murder case, to charge on the subject of self-defense, where the sole defense was accidental killing. (*Post, p. 509.*)

6. SAME. *As to criminal responsibility.*

   The Court's charge as to legal accountability is correct in murder case, which states that a child under seven years of age is

State *v.* Davis.

conclusively presumed not to be accountable, that a person between the ages of seven and fourteen years is presumed *prima facie* incapable of committing crime, and that a person over fourteen years of age is presumed to be accountable for his acts and capable of committing crime. (*Post, pp. 510, 511.*)

FROM   HARDIN.

Appeal in error from Circuit Court of Hardin County. SAM HOLDING, J.

BROYLES & McDOUGAL for Davis.

Attorney-general PICKLE for State.

. McALISTER, J. ·The prisoner was convicted in the Circuit Court of Hardin County of the murder of one Charlie Ross, and his punishment fixed by the jury at confinement in the State penitentiary for a term· of fifteen years. He has appealed in error. The facts of the case are that in August, 1899, the prisoner was engaged in hauling wood along the public road, where a gang of men under a foreman were at work. The deceased, a boy about fourteen years of age, named Charlie Ross, was one of the hands engaged in road working. The prisoner is also a boy, and at the time of the killing was about fourteen years of age. On the day of the kill-

ing, the prisoner, in company with one Tas Shelby, passed along the public road, driving a wagon and two horses, on his way to the woods to get a load of wood. As he passed the gang of road workers, he had some words with Charlie Ross, whom he had previously known.

The evidence is conflicting whether the prisoner or the deceased offered the first insult. According to the testimony of the State's witnesses, the prisoner first applied a very opprobrious epithet to the deceased, which the latter returned with vigor, and threw a rock at the defendant as the latter drove away in his wagon. According to the testimony of the defendant, the epithet was first applied by the deceased, which was not returned by the prisoner.

Both sides agree that deceased threw a stone after the prisoner. It further appears that after getting his load, the prisoner returned with his team along the same road. The deceased, in the meantime, provided himself with a sycamore switch, and when the prisoner came up he struck him a few licks on his bare legs.

The testimony of the State's witnesses is that deceased was not mad, but returned to his work laughing. The prisoner did not, at the time, resent the switching or say anything, but he claims that the licks made welts or marks on his bare legs. The theory of the defense is that the pris-

·oner was afraid of deceased, and for this reason did not resent the switching.

It further appears that defendant drove on home, delivered his load, and, while there, procured his gun, loaded it with squirrel shot, and started back for another load of wood. On this return trip, at the request of defendant, Tas Shelby drove and the prisoner sat upon the wagon, with the gun across his knees. When they reached the point where the road hands were at work, the deceased, who was engaged in throwing the dirt out of a ditch with a shovel, looked up, and exclaimed: "Hello, Buck! What are you going to do with that gun?" He repeated the words, and about that time the prisoner arose from his seat, the gun was discharged, and the deceased fell, wounded in the mouth and breast, and expired in a few minutes.

The theory of the defendant is that the prisoner procured the gun with no intention of killing deceased. He testified that during the day he had seen some turtles on a log in the creek, and he carried the gun back with him to kill a turtle. It was further stated by the prisoner that Tas Shelby had become tired and did not wish to go back with him, and to induce Tas Shelby to accompany him, he told him he could hunt squirrels while he, the prisoner, was loading the wagon; that this was the only purpose of procuring the

gun and ammunition. It was then claimed that, as they returned along the road, Charlie Ross, the deceased, called to the prisoner, in a loud tone of voice: "Hello, Buck! What are you going to do with that gun?" repeating the words. Defendant claims that deceased had a road shovel in his hands, and stepped one foot out on the bank of the ditch; that he was then within three or four steps of the wagon, and, thinking that deceased was going to attack him with the shovel, defendant arose from his seat with the gun, not with the intention of shooting deceased, but to deter him from running on him; but that the gun was accidentally discharged before defendant got it to his shoulder, and that in this way Charlie Ross was accidentally killed.

Now, in opposition to defendant's claim that this was an accidental killing, several facts will be noticed, without undertaking to detail all the testimony:

1. The State's witnesses testify that deceased, at the time he was killed, was working in the ditch; that he had just thrown out a shovel of dirt and was getting ready to throw out another. They deny that he had advanced one foot on the bank of the ditch.

2. Giles Bailey, a witness for the State, says that when deceased asked defendant what he was going to do with that gun, that defendant rose up in the

wagon, cocked the gun, and shot him. John Rid-
dle, a respectable white man and overseer of the
road where those hands were at work, testified
that when deceased asked defendant what he was
going to do with the gun, that defendant arose
with the gun in his hands, and witness thought
he was preparing to shoot, and said: "Don't you
do that;" and just then the gun fired. Witness
was within fifteen or eighteen feet of defendant
when he fired.

Again, John Erwin, a most respectable witness, tes-
tified that, immediately after the killing, he went to
the scene, where he met defendant at the mouth
of a lane. Witness asked defendant why he killed
deceased. He replied, in substance, "that deceased
had thrown a rock at him, whipped him with a
switch, and he wanted to show him that he
could not always be running over him."

All these facts overthrow the claim of accidental
killing.

The first assignment of error arises upon the
following facts—namely: While the defendant was
on the stand, he was asked if John S. Erwin
did not ask him, within a few minutes after the
killing, what he killed the boy for, and if he,
defendant, did not say: "He threw a rock at
me, and whipped me with switches, and I wanted
to show him he could not always be running
over me." Defendant, in reply to the question,

proceeded to say that he told Miss Fannie Erwin
—at this point the Attorney-general objected to
what defendant told Miss Fannie Erwin. Defend-
ant then said he did not remember what he said
to Mr. John Erwin. The Attorney-general repeated
the question, and defendant said: "No, I don't
think I said that." Thereupon defendant was asked
by his counsel what he said to Miss Fannie
Erwin. The jury was permitted to retire, and
in their absence defendant said he told Miss Fan-
nie Erwin that he didn't go to kill Charlie Ross.
The Attorney-general objected to the statement going
to the jury upon the ground that it was not a
part of the *res gestae,* and was self-serving. The
Court sustained the objection, and the evidence
was excluded. The State introduced John S. Erwin
in rebuttal. The witness testified that on the day
Charlie Ross was killed, John Riddle, overseer of
the road, came to the house, about one hundred
and fifty yards from the place of the killing,
and notified witness of the fact. Witness imme-
diately went down there and met the defendant
at the mouth of the lane, about ten steps from
the body of the deceased. Witness asked defend-
ant why he killed Charlie Ross, and defendant
said, in substance, that deceased threw at him,
and whipped him with a switch, and he, defend-
ant, wanted to show him he couldn't always be
running over him. At the request of defendant's

attorney, the jury had retired when this evidence was heard. Defendant's counsel then asked witness if defendant did not also say, in the same con-nection, that he did not go to do it. Witness replied that after this conversation with defendant he went to the body of deceased. Defendant also went to said body. Some one was talking to de-fendant, and witness heard defendant say: "I didn't go to kill him." This was probably from one to five minutes after the conversation witness had with defendant. Witness also stated, in this connection, that his wife, Mrs. Fannie Erwin, came to the scene of the killing just a little while after he got there.

The Court excluded the statement made by the defendant to the effect that "he didn't go to kill him," but admitted, over objection of defend-ant's counsel, the conversation of defendant with witness, Erwin. Defendant's counsel reserved an exception to the action of the Court in both par-ticulars. Defendant's counsel insists that this lat-ter statement should have been heard, because it was a part of the account given by the defend-ant of the killing so closely connected with the conversation related by Erwin that it should all be heard together.

We know of no principle that would admit this testimony. The statements made to Miss Fannie Er-win was not part of the *res gestae,* unless made

at the time of the act which they are calculated to characterize. *Nelson* v. *State,* 2 Swan, 257; *Mayfield* v. *State,* 101 Tenn., 676. Nor were those declarations part of the conversation between the prisoner and the witness, John Erwin, but they were made at a different time to another person, and are clearly self-serving.

It was objected that the testimony of John Erwin was improperly admitted, because it was evidence in chief. It would have been admissible as evidence in chief as a confessional statement, but was also admissible in rebuttal to contradict the evidence of defendant, in the discretion of the Court.

It is also assigned as error that the trial Judge omitted to charge the law on the subject of self-defense. It is insisted that such a charge should have been given without any special request. The theory of accidental shooting, relied on by the defendant, was wholly inconsistent with the idea of self-defense, and such a charge would have been wholly inappropriate.

It was also objected that the Court charged the jury on the subject of passion and heat of blood. This subject was touched upon by the Court in explaining the law of voluntary manslaughter. It was the duty of the Court to explain to the jury the different degrees of felonious homicide, and the several elements constituting

and distinguishing such offenses, and an omission to charge fully on the subject would have been error.

Other exceptions are taken to the charge, but we think them hypercritical and insubstantial. A question was made in respect of the legal accountability of the defendant. There was some evidence tending to show that he was under fourteen years at the time of the killing, but the preponderance of the evidence showed that he was nearer fifteen years of age. The Court correctly charged the law on this subject, viz.: "There is no exact time when it can be said with certainty that people arrive at the age of accountability, but the law conclusively presumes that a person under the age of seven years is incapable of committing crime, by reason of his presumed lack of understanding sufficient to distinguish between right and wrong, and that a person between the ages of seven and fourteen years is *prima facie* incapable of committing crime; that in order to establish as criminal the act of a person between the ages of seven and fourteen years, it must affirmatively appear that the person doing the act was of such maturity of mind and of sufficient discretion to distinguish between right and wrong, and a person over fourteen years is presumed by law to be accountable for his acts and capable of committing crime," etc.

State *v.* Davis.

This was a correct exposition of the law, and the question of accountability was fairly left to the jury upon the facts in proof.

We find no error, and the judgment is affirmed.