DIANE WAGNER, by Next Friend and Natural Guardian, Dan Wagner, v. GWEN NIVEN and John Bruno.

DAN WAGNER v. GWEN NIVEN and John Bruno. No. 6. —332 S. W. (2d) 511.

Western Section. August 31, 1959.

Certiorari Denied by Supreme Court February 5, 1960.

582

James D. Causey and William H. Williams, Memphis, for plaintiffs in error.

Emmett W. Braden and Elmore Holmes III, Memphis, Armstrong, McCadden, Allen, Braden & Goodman, Memphis, of counsel, for Gwen Niven.

Hunter Cochran, Memphis, for John Bruno.

BEJACH, J. We have before us, in these consolidated causes, companion suits for personal injuries and damages arising out of a collision that occurred at the intersection of Park Avenue and Cherry Street in Memphis, Tennessee, on March 6, 1957, at approximately 6:40 o'clock P. M. The minor plaintiff, Diane Wagner, suing by next friend and natural guardian, Dan Wagner, was a passenger in one of the automobiles, a Packard, driven by her friend and companion, another minor, Gwen Niven; which automobile was at that time being driven westwardly on Park Avenue, and which at the time of the accident was attempting to make a left turn southwardly into Cherry Street. Diane Wagner was, at the time of the accident, 15 years old and at the time of the trial, 16. Gwen Niven was, at said times, 14 and 15 respectively. The other automobile, a Plymouth, was, at the time of the accident, owned and operated by the defend-

ant, John Bruno, and was, at that time, being driven by him eastwardly on Park Avenue. The companion suit is that of Dan Wagner, father of Diane Wagner who sued Gwen Niven and John Bruno for medical expenses and for loss of services of Diane Wagner. The record shows that Diane Wagner and Gwen Niven were close friends and had been such for some time prior to the accident. Originally, Mr. and Mrs. John W. Niven, father and mother of defendant Gwen Niven, were also sued as defendants. Mr. and Mrs. John Bruno also brought suits against Mr. and Mrs. John W. Niven and Gwen Niven and their suits were tried along with the suits of Diane Wagner and Dan Wagner. By order duly entered, James S. Shields was appointed guardian ad litem for Gwen Niven and later by appropriate order, Clyde West was substituted as such guardian ad litem. Said causes were tried before a jury in February 1958, but the jury, being unable to agree, a mistrial was entered February 20, 1958. Thereafter, on September 15, 1958, said causes again came on for trial, at which time plaintiffs Diane Wagner and Dan Wagner were granted voluntary nonsuits as to Mr. and Mrs. John W. Niven, leaving their respective causes of action against Gwen Niven, a minor, and against John Bruno. On February 23, 1958, the jury returned a verdict in favor of Diane Wagner and against Gwen Niven in the amount of $2,000, and in favor of Dan Wagner against Gwen Niven in the amount of $1,000, but returned verdicts in said causes in favor of defendant John Bruno. The jury also returned verdicts in favor of Mr. and Mrs. John Bruno against Mr. and Mrs. John W. Niven and against Gwen Niven, the verdict for Mr. Bruno being for $7,500 and that in favor of Mrs. Bruno for $12,500. Motions for new trial were filed by

plaintiffs, Diane Wagner and Dan Wagner, against defendant, John Bruno, which motions were overruled. Motions for new trial were also filed against plaintiffs, Diane Wagner and Dan Wagner, by defendant Gwen Niven, which motions for new trial were based upon the contention that the trial judge should have granted defendant Gwen Niven's motions for directed verdicts made at the conclusion of all the proof, before said causes were submitted to the jury. Said motions for new trial of defendant Gwen Niven against plaintiffs Diane Wagner and Dan Wagner were granted by the trial judge and their suits dismissed. The orders granting Gwen Niven's motions for new trial and dismissing said suits contained the following recitals:

"The court is of the opinion that as a matter of law on the plaintiff's testimony he should have sustained the defendant Gwen Niven's general motion for a directed verdict made at the conclusion of all the evidence, and that he should now sustain the defendant Gwen Niven's motions solely on that ground.

"The court is further of the opinion that but for the fact of sustaining the defendant Gwen Niven's motion for a directed verdict made at the conclusion of all the evidence, he would otherwise approve the verdict of the jury."

Thereafter, plaintiffs, Diane Wagner and Dan Wagner, filed motions for new trial as against defendant Gwen Niven, which were overruled. Said plaintiffs then prayed, were granted, and have perfected their appeals in error to this court.

In this court, as appellants, plaintiffs Diane Wagner and Dan Wagner, as against defendant and appellee,

Gwen Niven, have filed four assignments of error, and, as against defendant and appellee, John Bruno, one assignment of error.

The one assignment of error against defendant in error, John Bruno, which we will dispose of first, is, "There is no evidence to support the verdict." The theory of plaintiffs with reference to this assignment of error, as against defendant John Bruno, is that because Police Officer Robert E. Weakley, who investigated the accident immediately after is occurrence, testified that the Packard automobile which weighed over 4,000 pounds was 12 feet from the point of impact with the Plymouth automobile which weighed only 2,969 pounds, they contend it must be inferred that the lighter automobile knocked the heavier automobile back that distance, and, consequently, that it must be inferred from the physical facts that defendant John Bruno was at fault and solely responsible for the collision. This contention is unsound, because, even if we assume that the Plymouth did knock the Packard 12 feet, it does not necessarily follow that defendant John Bruno was guilty of negligence, or that such negligence, either alone or concurrently with that of defendant Gwen Niven, was the proximate cause of the injuries to plaintiffs. Furthermore, from the testimony of defendant John Bruno, Mrs. Bruno, Mrs. D. D. Tomlinson, who was riding in their automobile, and other witnesses, the jury might, and obviously did find as a fact that John Bruno was wholly free from any negligence which constituted all or any part of the proximate cause of the accident. In that situation, under well settled principles of law, this court must, on appeal, consider the evidence adduced in the light most favorable to the party successful below. Fairbanks-Morse & Co. v. Gam-

bill, 142 Tenn. 633, 222 S. W. 5; Smith v. Tate, 143 Tenn. 268, 227 S. W. 1026; Cincinnati, N. O. & T. P. R. Co. v. Denton, 24 Tenn. App. 81, 140 S. W. (2d) 796; D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 508, 206 S. W. (2d) 897; Young v. Spencer, 44 Tenn. App. 83, 312 S. W. (2d) 479; Benson v. Fowler, 43 Tenn. App. 147, 306 S. W. (2d) 49; Callahan v. Town of Middleton, 41 Tenn. App. 21, 292 S. W. (2d) 501, 504; and numerous other authorities.

The assignment of error as against defendant John Bruno is accordingly overruled.

The four assignments of error filed as against defendant Gwen Niven present only two questions to be determined by this court, namely, 1st, whether or not the trial judge erred in granting, on motion for new trial, the motion for a directed verdict made by defendant Gwen Niven at the conclusion of all the proof, which question is presented by assignments of error I, II, and III; and, 2nd, whether or not the trial judge erred in allowing plaintiff Diane Wagner to be cross examined about conclusions contained in the declaration, which question is raised by assignment of error number IV.

We will first dispose of assignment of error number IV. It is plaintiff's theory, with reference to this assignment of error, that the testimony by plaintiff Diane Wagner given on cross examination, over the objection of plaintiff's counsel, constituted opinion evidence, with reference to which plaintiff should not have been permitted to testify. It is plaintiff's contention, also, that such testimony falls within the rule of law, "No witness, unexpert or expert, should be asked for his opinion or conclusion upon any material fact that is to be passed

upon by the jury as this invades the province of the jury." For this proposition, plaintiff's counsel cite Cumberland Tel. & Tel. Co. v. Stoneking, 1 Tenn. Civ. App. 241; Owen v. Jackson Ry. & Light Co., 1 Tenn. Civ. App. 413; and Memphis St. Ry. Co. v. Hicks, 1 Tenn. Civ. App. 513.

The cases cited constitute ample authority for the proposition of law as quoted; but said proposition of law does not, in our opinion, apply to the facts of the instant case. From Cumberland Tel. & Tel. Co. v. Stoneking, 1 Tenn. Civ. App. 241, at page 249, we quote as follows:

"The court erred a number of times in the admission of testimony with respect to the method of blasting. It is not the province of a witness to usurp the functions of the jury. It was highly improper to allow a witness to state that there was no carelessness, or that the blasting was properly done, or that there was no negligence, or that there was nothing unusual, and the like. The non-expert witness should detail the operation—that is, give the facts. An expert may give opinions hypothetically—that is, he may tell how blasting is properly done; but even he is not permitted to say that an operation that he witnessed or was informed of was properly or carefully performed."

From Owen v. Jackson Ry. & Light Co., 1 Tenn. Civ. App. 413, at pages 438-439, where the Court of Civil Appeals was ruling on the propriety of the lower court having excluded testimony to the effect that the use of a certain type of fender would have saved the life of a child, the answer to which question given outside the

presence of the jury was "I believe it would", we quote as follows:

"There is no error in excluding this question and answer, because the question called for and the answer undertook to answer the issue which the jury were to try."

In Memphis Street Ry. Co. v. Hicks, 1 Tenn. Civ. App. 513, it was held that medical testimony to the effect that plaintiff's injuries had not been caused by the collision involved in the suit, had been improperly admitted by the lower court. From the opinion of the Court of Civil Appeals in that case, at pages 522-523, we quote as follows:

"Now, was it proper for the court to permit these medical experts to pass upon that question, or was it within the sole province of the jury? We are of opinion, after a careful and painstaking examination and review of the authorities that the admission of this evidence, in this case, in the form in which it was admitted, was error."

The testimony of plaintiff Diane Wagner, which it is contended by assignment of error No. IV should not have been admitted in evidence, and which by assignments of error I, II, and III, it is contended should not be held to be conclusive against her cause of action, even though some of it may be properly construed as expressions of opinion on her part, is, in our opinion, entirely different in character from that held in the above quoted authorities to have been improperly admitted in evidence. In order that our rulings with reference to same may be clearly understood, we quote at length from her testimony, as given on cross examination, as follows:

590

"On cross-examination by Emmett W. Braden, Attorney for the defendant Gwen Niven, the plaintiff Diane Wagner testified as follows:

"Q. Now, Diane, I noticed your lawyer, Mr. Causey, did not ask you anything about the facts of the accident; do you know what happened in the accident? A. All I know is, we were making a turn and something hit us.

"Q. Gwen was driving? A. Yes, sir.

"Q. Did she have her lights on? A. Yes, sir.

"Q. As she approached the intersection, she was going slow? A. Yes, sir.

"Q. Real slow? A. Yes, sir.

"Q. Do you know what the blinker lights are on an automobile? A. Yes, sir.

"Q. Do you know whether Gwen had her blinker lights on to make a turn? A. Yes, sir.

"Q. Do you know about where she put them on? A. Where the King estate is now; no, it is now Harding College.

"Q. She was driving on her right side of the road or street, was she not? A. Yes, sir.

"Q. Do you drive an automobile? A. No, sir.

"Q. You have driven with other people, have you not, Diane? A. Yes, sir.

"Q. You know how people should drive an automobile? A. Yes, sir.

"Q. Was she driving that automobile on the right side of the road? A. Yes, sir, she was driving very cautiously and doing everything just right. We talked about it before, and she did everything because she felt we might not make it home, and we didn't.

"Mr. Cochran: I didn't understand her answer.

"Q. Would you repeat your answer? A. We thought we mightn't make it back in time or something like that, and we didn't.

"Mr. Cochran: I can't hear her testimony; will you have her repeat her last answer?

"Q. Would you repeat your answer for Mr. Cochran? A. She was driving cautiously and she did what she was supposed to do.

"Mr. Cochran: I thought she—I thought you said she was afraid of something; what was she afraid of? A. She was trying to obey the rules and everything, and she didn't want to have an accident.

"Mr. Cochran: I thought I understood the witness to say she was afraid of something.

"Mr. Braden: Do you want to continue with your examination, or shall I continue with mine?

"Mr. Cochran: I had to hear the witness before I can competently represent my client.

"Q. Then, it is true, Diane, that as she came up to Cherry, she was going south on Cherry to go to your home? A. Yes sir.

"Q. You say when she came up there she was going slow? A. Yes, sir.

"Q. She had her lights on? A. Yes, sir.

"Q. She had the flasher lights on? A. Yes, sir.

"Q. Just tell us what happened as she started to make a left turn and got to the middle of the intersection, what happened? A. I saw an outline of a car and it hit us.

"Q. There is nothing wrong with your eyesight, is there? A. No, sir, I have perfect vision.

"Q. Were you looking to the west in the direction Gwen was driving, as you approached that intersection? A. Yes, sir.

"Q. Did you see any lights on a car approaching you? A. I didn't see a car.

"Q. When was the first time you saw or was conscious of the fact an automobile was about to strike the car you and Gwen were riding in? A. I saw the outline of it, and that's all I saw. I saw the outline from where I was sitting; it would be the left and my right side, I suppose.

"Q. What happened then? A. We had a collision.

"Q. Did it hit you a heavy blow or a light blow, or just what happened to you? A. It hit us awfully hard and it happened very quickly.

"Q. Did this car give you any warning before it struck you? A. No, sir.

"Q. Do you know how fast the car was going that struck you? A. No, sir.

"Q. Did you have an opportunity to see or judge its speed? A. No, sir.

"Q. You say you were looking ahead? A. Yes, sir.

"Q. You didn't see any automobile with lights on it just before the collision? A. That is correct.

"Q. You and Gwen are friends? A. Yes, sir.

"Q. You have been friends? A. Yes, sir.

"Q. Are you telling the truth, Diane, or are you trying to defend Gwen? A. I am telling the truth.

"Q. I have never talked to you about the accident except to speak to you and I heard your testimony at the last trial; is that correct? A. Yes, sir.

"Q. So, so far as you know, from riding with other people, Gwen was driving that automobile just as well as any adult would have driven it under the circumstances? A. Yes.

"Q. I omitted one question, Diane: After this accident, it has been testified that you made some statement in front of Mr. Bruno, that you told Gwen she couldn't make it; did you make any statement like that? A. No, sir.

"Q. Were you even close to Mr. Bruno? A. No, sir, I never saw Mr. Bruno.

"Mr. Braden: That is all."

Cross examination by Hunter Cochran, attorney for the defendant John Bruno:

"Q. She went on up Park where she was going to make a left turn and turn into Cherry? A. Yes.

"Q. Did she turn her left-hand blinker signal on to turn into Cherry? A. Yes.

"Q. Why is it you remember that one? A. Well, you see, the King estate starts right about a block before Cherry and I always look at it when I'm passing by and I just naturally do, and so I glanced over at the King estate, and I remember her turning on her flicker where it starts.

"Q. In looking over at the King estate, you saw that the blinker signal was on? A. Yes.

"Q. What position were you sitting in in the car, then, looking straight ahead, except for looking over there or sitting sideways, or how were you sitting in the front seat? A. Like this was the front seat (indicating), I was sitting sort of like this (indicating).

"Q. Sitting sort of—(interrupted) A. I mean I could see straight out the front windshield, but I could also glance out the side if I wanted to.

"Q. And so, when you glanced over at the King estate, you saw that the blinker signal was on? A. Yes.

"Q. What did you see that told you the blinker signal was on in that car? A. A little green light flickering off and on.

"Q. A little green light flickering off and on? A. Yes.

"Q. But you didn't see that green light back up at Park and Perkins when you turned right? A. I don't recall it; I don't recall her turning it on.

"Q. Now, you say that Gwen was driving carefully? A. Yes, sir.

"Q. All along there? A. Yes, sir.

"Q. She was driving slowly? A. Yes.

"Q. She was watching where she was going? A. Yes, sir.

"Q. And keeping a lookout ahead? A. Yes.

"Q. She was making a proper lefthand turn, was she? A. Yes.

"Q. Ma'am? A. Yes.

"Q. Did she stop before making that left-hand turn? A. I believe she almost came to a complete stop when making the turn.

"Q. Almost came to a complete stop before making the turn? A. Yes.

"Q. And at that time, did you look ahead to see whether any vehicle was coming? A. Yes.

"Q. Did you see any? A. I saw nothing.

"Q. And then she proceeded on into the turn? A. Yes, sir.

"Q. And was it instantly that the accident happened? A. Yes.

"Q. After she had slowed and after you had looked ahead and saw nothing, right after that, then, the accident happened? A. Yes.

"Q. Now, Diane, in your declaration filed here in this cause of action—(interrupted) A. I know nothing about the paper.

"Q. And which was filed on November 14, 1957, 'Diane Wagner, by next friend and natural guardian', if your lawyer said this, 'Plaintiff avers'—talking about you—'that the defendant, Gwen Niven, was guilty of negligence as follows: "1. Failing to keep a proper lookout ahead" '—(interrupted) A. I know nothing of that paper.

"Q. That's not right, is it, Diane?

"Mr. Causey: I object to Mr. Cochran cross-examining this young lady about this Declaration. That is for the jury—we are entitled to all the testimony and—(interrupted)

"Mr. Cochran: I don't want Mr. Causey testifying about this.

"Mr. Causey: He knows I never talked to that young lady—(interrupted)

"The Court: The Court will overrule the objection.

"Q. Now, Miss Wagner, I am going to ask you just a few questions here. If this Declaration filed in this Court says that Gwen Niven was guilty of negligence in failing to keep a proper lookout ahead, you now say that is not so? A. I don't know anything about that paper, and I am telling the truth.

"Q. I didn't ask you anything about that paper. A. You're reading off of it.

"Q. You are saying it is not so?

"Mr. Causey: That calls for a conclusion from the witness.

"The Court: The Court will overrule the objection.

"Q. Now, I am not trying to do anything improper at all, and if you will listen to me, we can do this right. I simply ask you, if your Declaration says that Gwen Niven failed to keep a proper lookout ahead, then it's wrong? A. It's wrong.

"Q. It is? A. Yes.

"Q. Now, if it charges in No. 2 that she turned left when she couldn't safely do so, you say now that that's wrong? A. Yes.

"Q. All right, now, No. 4; in that you have charged Gwen Niven with failing to apply her brakes and stop when she saw or should have seen a collision was imminent; that's wrong too, is it? A. I saw nothing; there wasn't any evidence of anything like that, that there was going to be a collision.

"Q. If that's in your Declaration, it's wrong, isn't it; is that what you're saying? A. I suppose; yes.

"Q. And now, in No. 5, you charged Gwen Niven with failure to keep her vehicle under proper control; that's wrong too, is it? A. Yes.

"Q. And in No. 6, you say that she failed to make a proper and lawful turn, proper and lawful left-hand turn, and that's wrong too, is it? A. Yes.

"Q. And in No. 7, you charge that she failed to give a signal of her intention to turn left; you are now saying she did give a signal, aren't you? A. I said it this time and I said it at the time before.

"Q. And of course, you say in your Declaration that she failed to give a signal indicating she was going to turn left and that's wrong, isn't it? A. Yes.

"Q. And in No. 8, you charged Gwen Niven with heedlessly and recklessly operating said vehicle without being a qualified driver; was she heedless and reckless—heedlessly and recklessly operating a vehicle? A. No, she wasn't a qualified driver."

On further cross examination by Mr. Braden:

"Q. Diane, Mr. Dobbs said some cars had passed you and had their lights on before this accident; is that the truth? A. Yes.

"Q. This car that hit you didn't have the lights on it, did it, Diane? A. No, sir.

"Mr. Braden: That is all."

 The scope of cross examination rests largely in the sound discretion of the trial court. Turner v. State, 188 Tenn. 312, 219 S. W. (2d) 188; Dennie v. Isler, 8 Tenn. App. 1. An especially wide latitude is to be allowed in the cross examination of a party who offers himself (or herself) as a witness. Kroger Grocer & Baking Co. v. Stewart, 8 Cir., 164 F. (2d) 841; Hoffman v. Illinois Term. R. R., Mo. App., 274 S. W. (2d) 591. It is not an abuse of discretion for the trial court to allow a witness to be asked questions on cross examination calling for opinions or conclusions. Dennie v. Isler, 8 Tenn. App. 1; and it is proper to cross examine a witness concerning prior expressions of opinion inconsistent with his testimony. And, finally, with reference to assignment of error No. IV, a judgment will not be reversed on account of improper admission of evidence,

unless it affirmatively appears that such error affected the results of the trial. Sec. 27-117, T. C. A. Consequently, even if we should be wrong in holding that the cross examination was proper, the judgment in the instant case can not be reversed unless it affirmatively appears that erroneous admission of testimony affected the result of the trial. The record before us does not reflect any such situation. Assignment of error No. IV is, accordingly, overruled.

This brings us to the real determinative issue of this law suit, presented by Assignments of Error I, II, and III, viz., whether or not the testimony of plaintiff Diane Wagner to facts which, if true, defeat her right of recovery, is conclusive against her, or whether, in that situation, she is entitled to retain the benefit of a jury verdict in her favor based on the testimony of other witnesses.

Obviously, plaintiff Dan Wagner's right of recovery, if any, is based on the right of his daughter Diane Wagner to recover; consequently, we need consider only the testimony of Diane Wagner, as it affects her right of recovery.

Counsel for plaintiffs have filed an excellent brief containing elaborate citation of authorities from Tennessee and from other jurisdictions. In our opinion, however, it is unnecessary to consider authorities from other jurisdictions; and especially so, as the weight of authority seems to be in accord with the Tennessee decisions. The questions involved have been covered by annotations in 50 A. L. R. 979, 80 A. L. R. 619 and 627, and 169 A. L. R. 798; but the Tennessee decisions on the subject are adequate to control our disposition of the matter.

We have carefully examined the annotations in 50 A. L. R. 980, 80 A. L. R. 619, 624, and 169 A. L. R. 798. The annotation in 50 A. L. R., printed in 1927, deals with the specific question involved in the instant case, viz., the right of a party to have his case submitted to a jury when his own testimony negatives his right of action or defense. From that annotation, we quote as follows:

"An examination of the decisions reveals that when a party testifies to positive and definite facts which, if true, would defeat his right to recover or conclusively show his liability, and such statements are not subsequently modified or explained by him so as to show that he was mistaken although testifying in good faith, it has generally been held that he is conclusively bound by his own testimony, and cannot successfully complain if he is non-suited or the court directs a verdict against him." 50 A. L. R. 980.

The annotation in 80 A. L. R., 624, printed in 1932, deals with the conclusiveness of the testimony of a party where such testimony is adverse to the position taken by him in the lawsuit. From this annotation, we quote as follows:

"The statement which comes nearest to enunciating a true general principle seems to be that of the Massachusetts court in Hill v. West End St. R. Co. (1893) 158 Mass. 458, 33 N. E. 582, 3 Am. Neg. Cas. 883, that a party may be permitted to contradict his own testimony 'if the circumstances are consistent with honesty and good faith' ". 80 A. L. R. 624.

The annotation in 169 A. L. R. 798, printed in 1947, says "This annotation supersedes that on the right of a party to have his case submitted to a jury when his

own testimony negatives his right of action or defense, in 50 A. L. R. 779; and that on the conclusiveness of testimony of a party, in 80 A. L. R. 624." From this annotation we quote as follows:

"Under the older practice and prevailing rule, a party is entitled to have the benefit of the testimony of other witnesses in contradiction of his own, wherever his own is not of the character of a judicial admission, and concerns only some evidential or constitutent circumstance of the case.

"This is especially so as to circumstances of an accident or similar event, because in such a case the party's testimony is especially subject to inexactness of observation and memory."

Specific examples of cases where plaintiffs were held entitled to have the benefit of jury verdicts notwithstanding their own unfavorable testimony are, Connelly v. Conn. Co., 1928, 107 Conn. 236, 140 A. 121; and Kanopka v. Kanopka, 1931, 113 Conn. 30, 154 A. 144, 80 A. L. R. 619. The case of Kanopka v. Kanopka is especially similar on its facts to the case at bar; and, probably, if plaintiff in the instant case were suing in the State of Connecticut, she would be entitled to retain the benefit of the jury verdict returned in her favor.

The annotation in 169 A. L. R. 798 cites the Tennessee case of Roddy Mfg. Co. v. Dixon, 1937, 21 Tenn. App. 81, 105 S. W. (2d) 513, which case is also cited in the brief of counsel for defendant Gwen Niven. It will be more fully discussed hereinafter.

The principal Tennessee decision relied on by plaintiffs is Buice v. Scruggs Equip. Co., 37 Tenn. App. 556, 267

S. W. (2d) 119. In that case, the complainant Buice had sued for breach of a contract to convey stock in the defendant corporation. He recovered a decree for damages in the lower court which was affirmed by the Court of Appeals (Eastern Section). A petition to rehear was filed, however, in which it was contended that complainant, in his rebuttal testimony, had given other testimony which repudiated his previous testimony with reference to the agreement on which the suit was predicated. In the opinion overruling the petition to rehear, Howard, J., speaking for the Court of Appeals (Eastern Section), said:

"Thus we conclude that the complainant's alleged contradictory testimony was not fatal, as there was other credible evidence to support his contention that the contract was made in April or the 'spring' of 1951.

"The rule is well established in this state that where an interested party in his testimony makes a material statement of fact negativing his right of action or defense, and no more favorable testimony appears, he is bound by it. Johnston v. Cincinnati, etc. Ry Co., 146 Tenn. 135, 157, 240 S. W. 429; Harris & Cole Bros. v. Columbia Water & Light Co., 114 Tenn. 328, 341, 85 S. W. 897; McLemore v. Charleston & M. R. Co., 111 Tenn. 639, 69 S. W. 338. However, where there is an explanation, or as here, where other credible evidence is presented, the weight and credibility of the negative testimony becomes a question for the determination of the jury and cannot be determined by the court as a matter of law. See Annotations 80 A. L. R. 627; 169 A. L. R. 798. Furthermore the jury under the evidence presented could have found

that they also discussed other matters, including the five hundred shares of stock, not made a part of the agreement.'' Buice v. Scruggs Equip. Co., 37 Tenn. App. 556, 582-583, 267 S. W. (2d) 119, 131.

Without quoting, or reviewing the actual testimony involved in the Buice case, we think it could be classified under the heading of contradictory statements of a witness which cancel each other out. Donoho v. Large, 25 Tenn. App. 433, 438, 158 S. W. (2d) 447, 448; Johnston v. Cincinnati, etc., Ry. Co., 146 Tenn. 135, 240 S. W. 429; De Grafenreid v. Nashville Ry. & Light Co., 162 Tenn. 558, 39 S. W. (2d) 274. The testimony of Diane Wagner which is involved in the instant case cannot be classified under that heading. Her testimony did not contradict other testimony given by her in the same case. On the contrary, it contradicted the allegations of her declaration, on proof of which, if at all, she was entitled to recover. The situation in the instant case is, as we see it, more nearly analogous to the principle of judicial estoppel. This rule of estoppel was applied by the Supreme Court in Stamper v. Venable, 117 Tenn. 557, 561, 97 S. W. 812, 813. In that the complainant attacked the validity of two deeds on the ground that the grantor in same was mentally incapable of executing them. A decree dismissing the bill was affirmed by the Court of Chancery Appeals, from whose decree a further appeal was then taken to the Supreme Court, where complainant undertook to contest the validity of one of said deeds on the ground that it was testamentary in character, and that there were other legal objections to it which were fatal to its validity. From the opinion of the Supreme Court disposing of this contention, written by Mr. Chief Justice Beard, we quote, as follows:

"While the appeal opens up the case within proper limitations, as to both these deeds, yet we find that the present attack is confined altogether to the instrument under which Mrs. Venable takes the Bristol property. As to this the complainants seem to have changed their ground of assault, and, while conceding that the opinion of the Court of Chancery Appeals has estopped them from further insistence on the 'essential grounds' referred to, they insist there are legal objections to this deed, fatal to its validity, which they now press as a reason for a reversal of the decree of that court.

"In the first place, it is said that the instrument in question is not a deed, but is rather a paper testamentary in character.

"It may be observed that this contention is against the repeated recitals of complainants' bill, in which it is characterized as a 'deed,' and the whole controversy up to the present has gone upon the theory that it was a deed speaking *in praesenti,* to be avoided, however, on the grounds of fraud, undue influence, and incapacity on the part of the grantor.

"In this condition of the record, there is room for the application of the rule, stated by Mr. Bigelow in his work on Estoppel (5th Ed., p. 603), 'That a party cannot, either in the course of litigation or in dealing *in pais,* occupy inconsistent positions.' Further treating of the same subject, the author (page 717) uses the following language: 'If parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralized.

The coercive powers of the law, available only between those who consented to its exercise, could be set at naught by all. But the rights of all men are in the keeping of the courts, and consistency of proceeding is therefore required of all those who come in or are brought before them. It may accordingly be laid down as a broad proposition that one without mistake induced by the opposite party, who has taken a particular position deliberately, in the course of litigation, must act consistently with it. One cannot play fast and loose.' '' Stamper v. Venable, 117 Tenn. 560-562, 97 S. W. 813.

The case of Johnston v. Cincinnati, N. O. & T. P. Ry. Co., 146 Tenn. 135, 240 S. W. 429, involved a suit on a contract, in which case complainant's bill alleged that the contract was on a cost plus basis, whereas complainant testified that the agreement relied on was for a reclassification. The cause was tried before a jury, and a motion was made for a directed verdict on the issue involving the nature of complainant's contract, which motion for a directed verdict was overruled. The cause was, however, reversed on appeal. From the opinion of the Supreme Court, we quote as follows:

"The question here is not one of the credibility of a witness or of the weight of evidence; but is whether there is any evidence at all to prove the fact. If two witnesses contradict each other, there is proof on both sides, and it is for the jury to say where the truth lies; but if the proof of a fact lies wholly with one witness, and he both confirms and denies it, and there is no explanation, it cannot stand otherwise than unproven. For his testimony to prove it is no

stronger than his testimony to disprove it, and it would be mere caprice in a jury upon such evidence to decide it either way.

"In Hamilton v. Zimmerman, 5 Sneed 48, Judge McKinney said that — 'The doctrine of estoppel, which, from motives of public policy or expediency, will not in some instances, suffer a man to contradict or gainsay what, under particular circumstances, he may have previously said or done * * * applies with particular force, to admissions or statements made under the sanction of an oath, in the course of judicial proceedings.''

"In that case the court held that, in consequence of complainant's admission in his pleading in a former case that he was defendant's clerk, he was then precluded from claiming that he was defendant's partner.

"In Stamper v. Venable, 117 Tenn. 561, 97 S. W. 812, 813, it was held that one whose suit was brought on the theory that an instrument was a deed, could not in the course of the suit be heard to claim that it was a will. * * *

* * * * * *

"And in the very recent case of Stearnes Coal & Lumber Co. v. Jamestown R. Co., 141 Tenn. 206, 208 S. W. 334, this court said:

" 'While the law of judicial estoppel is ordinarily applied to one who has made oath to a state of facts in a former judicial proceeding which in a later proceeding he undertakes to contradict, yet it is frequently applied, where no oath is involved, to one

who undertakes to maintain inconsistent positions in a judicial proceeding.'

"The principle underlying these decisions runs throughout the administration of justice, and is that a litigant who has deliberately taken a position will not as a matter of law be allowed to advantage himself by taking an inconsistent one either in the same or in another suit." Johnston v. Cincinnati, N. O. & T. P. R. Co., 146 Tenn. 158-160, 240 S. W. 436.

As applied to the facts of the instant case, the principle deducible from the above quoted authorities is that plaintiff having in her declaration alleged that Gwen Niven was guilty of certain specific acts of negligence therein alleged, ought not to be permitted, in her testimony, to deny and disclaim such acts of negligence without thereby forfeiting her right to recover. In the recent case of Lamon Harvey and United Taxi Co., Inc. v. Hortense Stewart, decided by this Court June 24, 1959, this court affirmed a judgment in favor of the plaintiff who had testified contrary to the allegation of her declaration on one of the grounds of negligence therein alleged, because there was ample and material testimony from other and disinterested witnesses that the defendants were guilty of other acts of negligence, also alleged in the declaration, which entitled plaintiff to a recovery independent of the particular ground of negligence alleged in the declaration which she in her testimony had contradicted. In the instant case, however, plaintiff Diane Wagner went down the line of charges made in her declaration, and one after the other disclaimed each and every one of them. If defendant Gwen Niven was free from each and every one of the acts of negligence

charged against her in plaintiff's declaration, then plaintiff Diane Wagner could not possibly be entitled, as a matter of law, to a recovery; and, in the face of her own testimony, plaintiff cannot be heard to complain because a directed verdict was granted against her. No explanation is made or offered as to why Diane Wagner testified as she did, except the obvious one that she, a child of tender years, under the emotional excitement of the trial, was determined to shield and protect her friend and companion, Gwen Niven. Gwen Niven was, at the time of the accident, 14 years old, and at the time of the trial, 15. Diane Wagner was at the time of the accident 15 years of age, and at the time of the trial, 16. It is settled law in this State that ''When a person reaches fourteen years of age any presumption of incapacity to commit crime ceases, and he is practically an adult in the eyes of the criminal law.'' Colley v. State, 179 Tenn. 651, 654-655, 169 S. W. (2d) 848, 849; State v. Davis, 104 Tenn. 501, 510, 58 S. W. 122. Since plaintiff, Diane Wagner, was old enough to be held accountable under the criminal laws of this State, *a fortiori*, she should be held accountable and responsible for the effect of her testimony given in a civil suit.

The case of Roddy Mfg. Co. v. Dixon, 21 Tenn. App. 81, 105 S. W. (2d) 513, cited and emphasized in the brief of counsel for defendant Gwen Niven, involved facts which are, in many respects, closely analogous to the facts of the instant case. In that case, the plaintiff, Lallee Dixon, a minor, who was riding as a guest in a truck belonging to Blount Ice Co., driven by defendant Roy Cooper, when it collided with a truck owned by the Roddy Mfg. Co. Plaintiff Lallee Dixon and his father R. S. Dixon sued the owners and drivers of both trucks, and

recovered in the lower court, verdicts and judgments against all defendants. On appeal, however, to the Court of Appeals (Eastern Section), the case was reversed as to the defendants Blount Ice Co. and Roy Cooper, its driver. From the opinion of the Court of Appeals by McAmis, J., now presiding judge of this court, we quote, as follows:

"Plaintiff testified that after going about a half mile he felt the driver Roy Cooper apply the brakes and that he then stood up and looked around the left corner of the cab. He says he then saw the truck of Roddy Mfg. Co. approaching about 50 feet away, traveling about 30 or 35 miles per hour, and that it was then in the middle of the road, which position it maintained until the trucks collided. With respect to the ice truck in which he was riding, plaintiff testified that it was on the right side of the highway in the direction in which it was going, running 15 or 20 miles per hour; the substance of his testimony being that it had gotten as far to the right as possible without going over an embankment on that side of the road.

\* \* \* \* \* \*

"We have seen that plaintiff and all his witnesses placed the ice truck upon the right side of the highway and they all testify that it was traveling only 15 or 20 miles per hour. It further appears from plaintiff's own testimony that when the Roddy truck appeared from around the curve the brakes were applied, and it is shown that when the impact occurred the ice truck had slowed to about 8 or 10 miles per hour. It is not now insisted, as we understand,

that the driver of the ice truck was guilty of any actionable negligence except that he failed to sound his horn when the Roddy truck appeared. But whether or not we correctly understand the position of counsel in this connection, *we think plaintiff is bound by this evidence* (emphasis ours) and unless the failure to blow the horn is evidence of negligence, we think it must be said there is no material evidence to support the verdict against the Blount Ice Company and Roy Cooper.

"As to the failure to sound the horn, there is no proof that this omission proximately contributed to the accident, since it is not shown that the driver of the Roddy truck was looking in another direction and failed to observe the approach of the ice truck. As a matter of fact Delap (the driver of the Roddy Mfg. Co. truck) says he saw the ice truck but was unable to avoid it because, as he says, it was on his side of the highway.

"Consideration should also be given to the fact that the driver of the ice truck had only a second or two in which to act after it appeared that there was about to be a collision. All of these facts appear without dispute from plaintiff's own testimony, and we do not think reasonable minds could differ upon this question. We are therefore of opinion that the motion for a directed verdict should have been sustained as to Blount Ice Company and Roy Cooper. The motion will now be sustained and the suit dismissed as to said defendants." Roddy Mfg. Co. v. Dixon, 21 Tenn. App. 81, 85, 87-88, 105 S. W. (2d) 515.

As stated above, we think decisions of the appellate courts of Tennessee furnish ample authority for the action of the learned trial judge in granting the motion of defendant Gwen Niven for a directed verdict in this cause, and that it was unnecessary for either him, in making that ruling, or this court, in affirming same, to consider decisions of other jurisdictions.

It results that all of the assignments of error filed in this court by plaintiffs, Diane Wagner and Dan Wagner her father, as appellants here, will be overruled and the judgment of the lower court affirmed. The costs of the cause will be adjudged against said appellants.

Avery, P. J. (Western Section), and Carney, J., concur.